CREASEY CORPORATION, Appellant, vs. DUNNING, Respondent.

*December 11, 1923—January 15, 1924.*

*Contracts: Construction: Parol evidence: Fraud: Misrepresentation as to contents of contract: Presumption as to knowledge of parties signing.*

1. A provision in a contract that the subscriber might purchase merchandise on credit to the amount paid as a membership fee in an association, and that any purchases in excess of that amount should be paid for when ordered, when construed with a subsequent provision, is not ambiguous, and is not open to the construction that a subscriber could discontinue his membership and obtain repayment of any remainder of the membership fee which would then be required to balance the subscriber's account for merchandise. p. 393.
2. Parol evidence is inadmissible to vary the terms of a contract between two parties in which there can be little doubt as to its meaning. p. 395.
3. Written contracts will not be set aside or explained away merely because careful attention is necessary for their comprehension, nor because a person of ordinary intelligence may not have comprehended their full meaning. p. 395.
4. In an action to recover on a contract, fraud may be proved by clear and satisfactory evidence to show that the contract never had any legal existence and that what appears to be a contract is not and never was one in fact. p. 395.
5. It cannot be said that there was any misrepresentation as to the contents of a contract which a grocer's wife, a person of · ordinary intelligence and understanding the English language, signed with full authority so to do, the contract not being misread to her, but read by her after she had several conversations with her husband on the subject. p. 396.
6. Signers of written instruments are presumed to know their contents and their legal effect; but this presumption is not conclusive in all cases. p. 396.
7. Where the parties to a written contract stand at arm's length and no confidential relation or disability is shown, and the contract is signed with full opportunity to know its contents, the plain meaning expressed therein shall prevail, though that meaning has been misrepresented. p. 396.
8. Defendant, who applied for membership in plaintiff corporation in July, 1919, and after paying the membership fee in October,

1920, received his certificate, which plainly stated that he could not trade in the certificate for merchandise, continued to buy merchandise, obtaining any advantage there may have been from reduced rates and other services of the plaintiff until September 1, 1921, is precluded from raising the defense that the agent who secured his application for membership represented that he could trade in his certificate for merchandise.   p. 398.

APPEAL from a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiff corporation brought action to recover $203.89, the amount alleged to be due for merchandise delivered to defendant between July 20, 1921, and September 8, 1921.

In an amended answer defendant admitted receipt of the goods and alleged payment therefor. By way of counterclaim defendant alleged that he was induced by the false and fraudulent representations of plaintiff's agent to buy a membership certificate in the plaintiff corporation; that it was falsely and fraudulently represented to him that the payment of $300 for this membership certificate would entitle him to a credit of $300 which he could use at any time toward the payment of merchandise; and that it was further represented that he could at any time drop his membership and receive back in cash any portion of this credit which had not been used.

In reply to the counterclaim plaintiff admitted that a membership had been sold to defendant before the claim in question arose, but denied that plaintiff was entitled to the credit of $300 and denied that any fraudulent representations had been made.

Plaintiff is a corporation engaged in the wholesale grocery business. Defendant was the owner of a grocery store which was in charge of his wife. In July, 1919, an agent of plaintiff solicited her to take out a membership in the plaintiff corporation. This membership was to cost $300 and to continue for twenty years. Its terms provided, in

part, that a member could buy groceries from plaintiff at cost plus a fixed percentage to cover operating expenses.

It appears that plaintiff's agent visited defendant's wife three times in reference to this membership, and that in the intervals between the visits defendant's wife explained the arrangement to her husband. At the third conference defendant's wife signed an application for membership, and agreed to pay $300 in instalments. This application contained, among others, the following provisions:

"The subscriber may purchase merchandise on credit to the amount of money he has paid in, subject to the terms hereinafter set out, less $50, the first payment, until the full $300 is paid. He may then purchase merchandise on credit to the extent of $300. It being understood that subscriber in purchasing merchandise in excess of his payments on this subscription, or in excess of $300, shall accompany his order with check for any such excess, but this does not restrict subscriber from purchasing merchandise in any quantity he may desire."

"This service membership shall be transferable when fully paid for to any retail merchant who shall be acceptable to the *Creasey Corporation.*

"It is understood and agreed by the subscriber that he will not have the right to trade out this contract in merchandise. All merchandise purchased must be paid for."

Other provisions specified that all the terms of the contract were contained in the written application and that the agent or solicitor was not allowed to make any other contract.

In October, 1920, after the $300 had been paid, a membership certificate or service contract was issued to defendant. This contained substantially the same provisions as the application for membership, except that the clause first quoted above in reference to purchases on credit to the extent of the sums paid in, less $50, was not included.

Thereafter defendant ordered goods from time to time and paid for them in the course of business. The goods for which no payment was made were the last ordered.

Concerning the fraudulent representations alleged, defendant's wife testified:

"She [plaintiff's agent] came in and told me she would like to have us members of the *Creasey Corporation,* that they were putting up a new branch at Green Bay and they want so many members: in order to become a member we had to pay in the amount of $300, but we wasn't giving that to the *Creasey Corporation,* we were just sending that in as a credit standing; that as soon as we put in our first payment—we sent that in on instalments—we could buy goods up to the amount that we had sent in, but not over the amount; at any time it went over that amount we had to include an extra check, but if we want to leave the credit standing in there, why, we had to send a check in full for whatever we ordered. And she also stated that at any time that we were dissatisfied we could draw our money out; it wasn't like giving the money to them, it was just there as a credit."

After stating that she had read the printed application she testified:

"And there was some clause in there about trading out in merchandise that I didn't understand, and I asked her, and she says that meant we couldn't sell our membership to any other merchant or trade it out to any other merchant."

The foregoing testimony was admitted over the objection of plaintiff's counsel. Defendant, over objection by plaintiff's counsel, was allowed to state what his wife had said to him in reference to statements of plaintiff's agent. Defendant testified further that when he had received the membership certificate in October, 1920, he and his wife had read it over and had decided that its terms were in accordance with their understanding of the application for membership.

The jury found that when defendant's wife signed the application for membership the plaintiff's agent represented that whenever defendant paid in full his subscription of $300 he would have a credit to that extent and could apply

it towards the purchase of merchandise or cancel his membership and receive back the balance not used for the purchase of merchandise.   In other answers the jury found that the plaintiff's agent made these representations knowing them to be false, and intending that defendant's wife should rely on them when she signed the contract.   The ninth question was as follows:

"Is the language of said contract so ambiguous and obscure that a person of the experience, intelligence, and ability of the defendant or his wife would not discover from reading said contract that its terms conflict with the terms of said representation?"    •

The jury answered "Yes" as to both defendant and his wife.

The tenth question was as follows:

"At any time before defendant contracted the indebtedness in suit, did he have knowledge or information that said representation conflicts with the terms of said contract?   A. No."

Judgment was ordered dismissing the complaint and awarding to defendant $96.11, with interest and costs, on his counterclaim.   This was the amount paid for the membership, less the claim in suit.

Other facts will be stated in the opinion.

For the appellant there was a brief by *Kittell, Jaseph & Young* of Green Bay and *Nash, Nash & Ledvina* of Manitowoc, attorneys, and *Lynn D. Jaseph* of Green Bay and *Walter J. Clark,* of counsel, and oral argument by *Lynn D. Jaseph.*

For the respondent there was a brief by *Kelley & Wyseman* of Manitowoc, and oral argument by *Harry F. Kelley.*

JONES, J.   The trial court ruled that the first paragraph quoted in the statement of facts was so ambiguous as to permit oral testimony showing the understanding of the

defendant's agent. That understanding is stated in the testimony above quoted and is summarized in the following question in the special verdict:

"At the time when defendant's wife, Mrs. Margaret Dunning, acting as his agent, signed his name to the membership or service contract, did plaintiff's agent, Miss Peterson, state and represent to Mrs. Dunning in substance that whenever the defendant paid in full his subscription of $300 on that contract he would thereby have a credit of that sum with the plaintiff corporation, which credit the defendant could apply in payment of the purchase price of any merchandise that he might thereafter buy from plaintiff; and that whenever said subscription was paid in full, the defendant, if he wished to do so, could thereafter at any time discontinue his membership in the plaintiff corporation and obtain from it the repayment to the defendant of any remainder there might then be of said $300 over and above the sum, if any, which would then be required to balance the defendant's account for merchandise that he had bought from plaintiff?"

Preceding the paragraphs above quoted there were clauses providing for the payment by the defendant of $302 which entitled him to the services of plaintiff, and containing an agreement by plaintiff to sell merchandise for cost plus the necessary cost of doing business. It will be seen that it contains no clause that when the subscription was paid in full the defendant could discontinue membership and obtain repayment of any remainder over $300 which would then be required to balance defendant's account for merchandise. Nor does it contain any language susceptible of such interpretation. On the contrary, it contains the explicit provision that if goods were purchased in excess of his payments or in excess of $300 defendant should accompany the order with a check for the excess.

Doubtless the meaning might have been expressed in language less liable to be misunderstood, but it seems to us that any possible doubt as to the meaning of the paragraph

claimed to be ambiguous is removed by the later clause, which expressly provides that the subscriber should not have the right to trade out the contract and that all merchandise must be paid for.

In speaking of what is known as the parol-evidence rule a very learned writer has said: "Few things are darker than this, or fuller of subtle difficulties." Thayer, Evidence, 390.

Another author has said:

"The admissibility of extrinsic parol testimony to affect written instruments is, perhaps, the most difficult branch of the law of evidence." 2 Taylor, Evidence (9th ed.) § 1128.

If the discussions in treatises and judicial opinions dealing with the admission of parol evidence to explain ambiguities, latent and patent, from the time of Bacon to the present day were to be collected they would fill many volumes. We shall not undertake the vain attempt in which so many have failed to lay down any general rule which should govern in determining in all cases whether parol evidence should or should not be admitted to explain a writing claimed to be ambiguous. Nor shall we undertake to review the innumerable decisions on the subject. Unlike the great majority of cases, this is not one in which it is claimed that a word or a phrase has an uncertain or equivocal meaning.

It is not a case where by usage of trade a word or clause has gained a particular meaning different from the ordinary meaning. It is not a unilateral document like a will where there has occurred an erroneous description of property or of a legatee and where extrinsic evidence has often been received to show the real intent of the testator.

We have here a contract between two parties in which there can be little doubt as to its real meaning. It is claimed that one paragraph would not be easily understood by a person of average intelligence and that therefore it is ambiguous, although another clause relating to the same subject is so plain as to exclude any doubt.

On the theory that the contract was ambiguous, testimony was received directly contradicting terms of the contract as to the meaning of which there could be no doubt. We know of no rule permitting the introduction of parol evidence to explain a written contract on the ground of ambiguity broad enough to cover the facts of this case. Written contracts are not to be set aside or explained away merely because careful attention is necessary for their comprehension; nor because a person of ordinary intelligence may not have comprehended their full meaning. When the plain meaning of a contract can be gathered from the whole instrument, it would be a dangerous rule that one of the parties could later successfully assert that he had a different intention from that expressed in the writing. Such a rule would prevent reliance on contracts made in absolute good faith; would render investments and titles insecure; and hold out an inducement to fraud and perjury.

It is claimed by counsel for defendant that the contract was obtained by fraudulent representations as to its contents and meaning. It is a familiar exception to the parol-evidence rule that fraud may be proven by clear and satisfactory evidence to show that the contract never had any legal existence and that what appears to be a contract is not and never was one in fact. It is also true that where that issue is raised, broad range may be given to the testimony.

The claim is made by plaintiff's counsel with much force that there was no adequate proof that any misrepresentations were made. The solicitor did not testify and her evidence was not obtainable. The only witness to the fraud alleged was the defendant's wife, who had full authority to make the contract. Her testimony was materially weakened by the fact that on the trial in the municipal court, six months before the trial in the circuit court, she testified that the subject of getting the money back was not brought out; that she understood that they could buy up to that

amount at any time, and that she did not remember that they discussed the subject of applying the $300 on merchandise to be bought. But the jury found for the defendant on this issue, and we shall discuss the subject on the theory that the representations were made as claimed by defendant.

The wife of defendant had full charge of his grocery and had about eight years' experience in that business. She was not illiterate; on the contrary, her testimony shows that she was a person of at least ordinary intelligence and understood the English language. The writing was not misread to her. There was no device to prevent her reading it, and after several conversations with her husband on the subject she did read the application. Hence it cannot be said there was any misrepresentation as to the contents of the instrument. If there was any false representation it related to the meaning and legal effect of the contract.

It is a familiar rule that those who sign written instruments are presumed to know their contents and their legal effect; but the presumption is not conclusive in all cases; for example, if a lawyer enters into a contract with his client and intentionally misrepresents its legal effect, he should not shield himself from liability for his misconduct by invoking the rule that every one is presumed to know the law. Other illustrations might be given where persons holding confidential relations with another may be bound by misrepresentations even of the meaning of written contracts into which they enter. But where as in this case the parties stand at arm's length and no confidential relation or disability is shown and where the contract is signed with full opportunity to know its contents, there are very cogent reasons for holding that the plain meaning expressed in the writing shall prevail even though that meaning has been misrepresented.

The case of *Calkins v. State,* 13 Wis. 389, is most relied on by defendant's counsel as authority for the contention that the misrepresentations relied on in the present case are

admissible.   In that case the only point necessary to the
decision was whether it was proper to receive evidence of
misrepresentations as to the meaning of a few technical
words used in the printer's trade where that meaning was
well known to one of the parties but unknown to the other.
We do not consider that case controlling, especially in view
of later decisions of this court.   *Gates v. Parmly,* 93 Wis.
294, 66 N. W. 253, 67 N. W. 739; *Gormely v. Gymnastic
Asso.* 55 Wis. 350, 13 N. W. 242; *Equitable S. Co. v. Hart-
mann,* 177 Wis. 38, 187 N. W. 686.

The testimony relied on by defendant not only related
to misrepresentations as to the legal effect of the contract
but imported into it new terms wholly inconsistent with its
plain language.   We do not consider that the facts of this
case bring it within the exception to the parol-evidence rule
that written contracts may be impeached for fraud.

That exception is a salutary one upheld by the courts to
prevent fraud.   But we must not overlook the fact that the
general rule is also salutary, and intended to prevent those
who have knowingly and deliberately signed written con-
tracts, and have afterwards become dissatisfied, from re-
pudiating them to the injury of those who have relied on the
contracts.   The rule as well as the exception is designed to
prevent fraud.

There is another phase of the case which should be re-
ferred to.   The application for membership was made July
12, 1919.   After paying the membership fee, in October,
1920, defendant received the certificate of membership,
which very plainly stated that he would not be permitted to
trade the certificate in merchandise, but that it must be paid
for in accordance with the terms specified.

Defendant read the certificate, discussed the subject with
his wife, and then continued to buy merchandise, including
that in question, until September 1, 1921, obtaining any ad-
vantage there may have been from the reduced rates and
other service rendered by the plaintiff.   After this he sought

to repudiate the contract. In our judgment, by this conduct he was precluded from raising the defense relied on.

There was a demurrer *ore tenus* to the counterclaim and there were numerous objections to evidence. Since we conclude that on the whole testimony there is no basis for the defense, it is not necessary to discuss these questions.

*By the Court.*—Judgment reversed, and the cause is remanded to the circuit court with instructions to enter judgment for plaintiff as prayed in the complaint.